UNITED STATES DISTRICT COUR
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

DANIELLE HERBERT,

                                      Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK CITY BOARD
OF EDUCATION, NEW YORK CITY DEPARTMENT
OF EDUCATION, and SHANIQUIA L. SINGLETARY-
DIXON,

                                      Defendants.

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

08 CV 7892 (PGG)

------------------------------------------------------------------ x

        Pursuant to Local Rule 56.1 of the Civil Rules of United States District Court for the Southern District of New York, Defendants submit this Statement of Material Facts as to which they contend there are no genuine issues to be tried:

        1.        Plaintiff, formerly employed as a probationary assistant principal with the New York City Department of Education ("DOE"), brings this action alleging that the DOE discontinued her probationary services as an assistant principal and, thereafter, terminated plaintiff, because of plaintiff's pregnancy, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the New York State and New York City Human Rights Laws, Executive Law Section 296 and Section 8-502 of the Administrative Code of the City of New York, respectively, and, furthermore, alleges that such acts constituted retaliation against plaintiff, in violation of New York Civil Service Law Section 75 and New York Education Law Section 3028-d, because plaintiff had reported to authorities that Shaniquia Singletary-Dixon ("Dixon"),[1]

---

[1] Also known, during the relevant period, as Shaniquia Singletary.

defendant herein, allegedly had misappropriated school funds. See plaintiff's Complaint, dated August 29, 2008 ("Compl."), annexed as Exhibit "A" to the Declaration of Maxwell D. Leighton, dated August 10, 2009 ("Leighton Decl.").

**A.     Background**

2.     For the school year 1999 to 2000, plaintiff worked for the DOE as a Special Education Teacher, at Intermediate School 162. See id., at ¶ 15. See also Plaintiff's Deposition Transcript ("Pl. Tr.") at 15:6-12, annexed to the Leighton Decl. as Exhibit "B."

3.     Thereafter, in the school year 2000-2001, plaintiff transferred to Public School 161 in the position of a General Teacher. See Pl. Tr., 18:19-23.

4.     Beginning in school year 2003-2004, Principal Dixon, at that time an assistant principal at Public School 161, was one of plaintiff's supervisors, responsible for evaluating plaintiff's performance through classroom observations. Id. at 20:2-21:5.

5.     While at Public School 161, plaintiff believed Principal Dixon to be a "fair" supervisor. Id. at 20:14-18.

6.     Beginning in the 2004-2005 school year, Principal Dixon was hired as the Principal of Public School 149 and asked plaintiff to come with her, to serve as a literacy coach at Public School 149. Id. at 21:10-25. See also Singletary-Dixon's Deposition Transcript ("Dixon Tr.") at 24:5-14.

7.     Plaintiff accepted Principal Dixon's offer, and served as a literacy coach at Public School 149 during the 2004-2005 school year. See Pl. Tr. at 21:10-20.

8.     Moreover, Principal Dixon promised plaintiff that once plaintiff completed her education or training as an educational administrator, Principal Dixon would hire plaintiff as an assistant principal at Public School 149. Id. at 21:21 – 22:4.

9. Plaintiff thereafter attained her professional certificate and, for the 2005-2006 school year, was appointed as an assistant principal at Public School 149, holding this position until plaintiff's probationary services were discontinued on February 15, 2008. See Compl. at ¶¶ 21, 39.

**B.   Plaintiff's Performance as Assistant Principal**

10. As assistant principal, plaintiff was responsible, among other things, for supervising the teachers of the middle school department. See Pl. Tr. at 24:12-17.

11. By letter dated November 22, 2006, plaintiff was advised by Principal Dixon that she must be aware of all schedule changes, stemming from that day's mishap, in which several of the teachers under plaintiff's supervision improperly left school early. See Exhibit "D," annexed to the Declaration of Shaniquia Dixon, dated August 10, 2009 ("Dixon Decl.").

12. By letter dated January 30, 2007, Principal Dixon recounted her walkthrough of plaintiff's department, noting that based on her observations, plaintiff had not conducted her own assessment of her teacher's shoddy portfolios in the last five weeks. See Exhibit "E," annexed to the Dixon Decl.

13. By memorandum dated March 1, 2007, plaintiff, as well as her fellow assistant principals and the school dean, were advised by Principal Dixon that all school incidents and allegations must be reported to Principal Dixon and that administrators must take immediate action to address any and all incidents. See Exhibit "F," annexed to the Dixon Decl.

**C.   Special Commissioner of Investigation Complaint**

14. In a complaint form made to the Special Commissioner of Investigation for the New York City School District ("SCI"), dated December 7, 2006, a confidential complainant, claiming to be a parent from Public School 149, accused Principal Dixon of

misconduct, including an allegation that "there in a female assistant principal at the school (name unknown) who is having an affair with a janitor named Earl (surname unknown) and that they are 'touchy feely', especially in front of students. The principal does nothing and merely allows it to happen" See Exhibit "W," annexed to the Leighton Decl.

15. Thereafter, by letter dated March 12, 2007, Principal Dixon scheduled a meeting with plaintiff to discuss allegations that plaintiff had been "fraternizing with a member of the custodial staff." See Exhibit "F," annexed to the Dixon Decl.

16. At her deposition, plaintiff testified that, when she asked Principal Dixon about the allegations, Principal Dixon stated that "people . . . were talking about [plaintiff] and [the custodian]. See Pl. Tr. at 74:3-13.

17. The SCI complaint was referred to the DOE's Office of Special Investigations ("OSI"). OSI is a division of DOE, and "investigates allegations of improper and unlawful behavior, including corporal punishment and verbal abuse against students, to help ensure a safe and secure learning environment for New York City's students, staff members, and parents." See http://schools.nyc.gov/Offices/GeneralCounsel/Investigative/OSI/default.htm.

18. By a report dated April 17, 2007, Jackquelyn Young, a Network Leader, Empowerment Schools, and who was designated by OSI to investigate the allegations raised in the December 7, 2006 complaint, closed the investigation, determining that Principal Dixon had taken appropriate action once she became aware of the allegation against plaintiff and had begun the "process for a possible disciplinary conference" when outside investigators had intervened. See Exhibit "W," annexed to the Leighton Decl. Ms. Young deemed all allegations made against Principal Dixon unsubstantiated. Id.

### D.      Plaintiff's Disciplinary Letters-to-File

19. By letter dated April 12, 2007, Principal Dixon addressed a parent complaint that had been lodged against plaintiff. See Exhibit "H," annexed to the Dixon Decl.

20. The parent complaint, made via the New York City 311 phone system, concerned a special needs student who alleged that plaintiff had been rude to him, by telling the student that the "Principal did him a favor by letting [him] into school." Id.

21. As stated in the April 12, 2007 letter, and as plaintiff testified at her deposition, plaintiff admitted she had told the student that the principal did him a favor by allowing him to stay in the school. See id. See also Pl. Tr. at 81:16-24.

22. Principal Dixon advised plaintiff that such remarks were "unprofessional and inappropriate and . . . showed poor judgment" and further advised plaintiff that "[a]nother occurrence of this nature may result in an unsatisfactory rating for the 2006-2007 school year." See Exhibit "H," annexed to the Dixon Decl.

23. Plaintiff received a satisfactory rating for the 2006-2007 school year. See Dixon Tr. at 213:19-21.

24. Plaintiff returned to Public School 149 as assistant principal for the 2007-2008 school year.

25. By letter dated November 7, 2007, Principal Dixon wrote a letter to plaintiff's file, to memorialize a meeting she had held with plaintiff that day, regarding a parent's allegation that plaintiff had made inappropriate statements the day before. See Exhibit "I," annexed to the Dixon Decl.

26. In her deposition, Principal Dixon testified that the parent, Vice President of the school's Parent-Teacher Association ("PTA"), had reported to Principal Dixon that in a conversation with her, plaintiff had used "a lot of profanity." See Dixon Tr. at 177:10-13.

27. In the November 7, 2007 letter, Principal Dixon advised plaintiff that she needed to "work on finding a more professional yet direct approach when communicating with parents" and that failure to do so could result in further disciplinary action, including an unsatisfactory rating. See Exhibit "I," annexed to the Dixon Decl.

28. Thereafter, by letter dated November 8, 2007, the parent wrote a letter to Principal Dixon, further detailing the conversation held with plaintiff, quoting plaintiff's excessive profanity in response, and setting forth the PTA's various concerns with plaintiff's behavior at the school, including a belief that plaintiff was having an affair with the school's custodian, and requesting that Principal Dixon address its concerns. See Exhibit "Q," annexed to the Dixon Decl.

29. By letter also dated November 8, 2007, another parent, the PTA's Secretary, wrote to Principal Dixon regarding plaintiff's "inappropriate response" during the conversation with the PTA's Vice-President and set forth her concerns regarding plaintiff's behavior and alleged actions, including a suspected affair with the school's custodian. See Exhibit "R," annexed to the Dixon Decl.

30. By letter dated November 30, 2007, yet another parent, a past-PTA President, wrote to Principal Dixon reiterating concerns she had voiced previously regarding a suspected affair between plaintiff and the school's custodian, and further telling Principal Dixon that with plaintiff now pregnant, "students and parents alike are now talking about [the custodian] being the child's father." See Exhibit "S," annexed to the Dixon Decl.

31. At her deposition, Principal Dixon testified that she was told by Lawrence Harvey, her Network Leader, to report the parents' allegations to investigators, that thereafter she met with investigators from SCI and provided them with the statements of parents, and further

told SCI investigators that she had no direct knowledge of the alleged actions of plaintiff and that, as far as she was concerned, they were "unsubstantiated." See Dixon Tr. at 194:14 – 198:14.

32. By letter dated January 9, 2008, Principal Dixon wrote to the SCI investigator regarding the allegations made against plaintiff, writing that she could not fully substantiate any unprofessional behavior or misconduct between plaintiff and the school's custodian. See Exhibit "O," annexed to the Dixon Decl.

33. By letter dated December 18, 2007, Principal Dixon directed plaintiff to meet with her on January 2, 2008, "in regard to [plaintiff's] repeated lack of professionalism when verbally responding to members of the school community." See Exhibit "J," annexed to the Dixon Decl.

34. This December 18, 2007 letter was precipitated by an e-mail the day before, from Barry Daub, Principal of PS 811, informing Principal Dixon that "[plaintiff] just made a horrible scene on our side of the building involving our nurse in front of our students . . . ." See Exhibit "T," annexed to the Dixon Decl.

35. Principal Daub's e-mail provided an account of the incident involving plaintiff, wherein plaintiff yelled in front of staff and students that the school nurse had been rude to her and called the school nurse "worthless." Id.

36. By letter dated January 7, 2008, memorializing their January 2, 2008 meeting, Principal Dixon advised plaintiff that with respect to the nurse incident her "behavior and demeanor was unprofessional," that plaintiff's "ability to prioritize the appropriate actions [she] should take as the 'supervisor in charge' during a medical emergency is severely deficient,"

and that plaintiff's conduct had been unsatisfactory and "prohibit[ed] [her] ability to meet [her] primary responsibility as Assistant Principal." See Exhibit "K," annexed to the Dixon Decl.

37. By a second letter also dated January 7, 2008, memorializing their January 2, 2008 meeting, Principal Dixon advised plaintiff that she had "shown a pattern of . . . inability to prioritize appropriate actions as supervisor in charge of the building in the absence of the principal." See Exhibit "L," annexed to the Dixon Decl.

38. In this second letter, dated January 7, 2008, Principal Dixon notes that plaintiff had misrepresented facts regarding the amount of time that a suspended employee had been permitted, by plaintiff, to be in the school's main office, a location in which the suspended employee was not allowed, and during that time had engaged in conversation with plaintiff. Id.

39. Principal Dixon further states, in this second January 7, 2008 letter, that plaintiff's failure to follow through on the principal's directives, specifically forbidding a suspended employee from the school's office, was a dereliction of duty resulting in plaintiff's unsatisfactory performance as Assistant Principal. Id.

40. By letter dated January 2, 2008, LeShawn Hodge, the school's Parent Coordinator, wrote to Principal Dixon regarding an incident that had occurred on December 21, 2007. See Exhibit "U," annexed to the Dixon Decl.

41. Ms. Hodge writes that during a verbal altercation she had with another adult, occurring in the school, directly in front of plaintiff and with students present, that plaintiff had not interceded. Id.

42. By a third letter dated January 7, 2008, memorializing their January 2, 2008 meeting, Principal Dixon advised plaintiff that plaintiff had been negligent by "failing to respond to the potentially dangerous incident that occurred outside the main office . . . [which]

placed members of the school community in danger." See Exhibit "M," annexed to the Dixon Decl.

43. In this third letter, dated January 7, 2008, Principal Dixon states that, notwithstanding the fact that plaintiff was on the phone in the main office, plaintiff should have addressed the incident immediately. Id.

44. Principal Dixon stated that plaintiff's "ability to respond to situations and emergencies regarding incidents that occur in the school, while you are in charge, is seriously flawed" and that, based on this and other deficiencies, plaintiff's service for the 2007-2008 school is rated unsatisfactory and that Principal Dixon was recommending her probationary services be discontinued. Id.

45. By a fourth letter dated January 7, 2008, memorializing their January 2, 2008 meeting, Principal Dixon reiterated the incidents noted in the prior three letters, each dated January 7, 2008, as well as recounting additional past incidents demonstrating plaintiff's deficiencies and failure to improve despite the opportunity to do so. See Exhibit "N," annexed to the Dixon Decl.

46. Principal Dixon advised plaintiff that due to her "continued failure to perform in a satisfactory manner as an Assistant Principal at P.S./M.S. 149 and the negative impact it is having on our school community, I must rate you unsatisfactory and recommend the discontinuance of your probationary service to the Community Superintendent of District 3." Id.

47. Plaintiff was rated unsatisfactory in her Pedagogical Supervisory Personnel Report and Principal Dixon recommended that plaintiff's probationary services be discontinued. See Exhibit "P," annexed to the Dixon Decl.

48. Plaintiff was discontinued from her probationary services effective February 15, 2008. See Compl. at ¶ 39. She was returned to the position of Teacher and removed from Public School 149. Id.

### E. Review of Plaintiff's Discontinuance

49. Pursuant to Section 4.3.2 of the By-Laws of the Panel for Educational Policy of the Department of Education of the City School District of the City of New York, plaintiff was afforded a review of her discontinuance. Section 4.3.3 of the By-Laws provided that plaintiff receive notice of her review, informing plaintiff that she has the right to appear in person with a union representative, to be confronted by witnesses, if any, to call witnesses, to examine exhibits and to introduce any relevant evidence. See Copies of Sections 4.3.2 and 4.3.3, annexed to the Leighton Decl as Exhibit "X."

50. On June 25, 2008, plaintiff and her union representative attended a Chancellor's Committee Review of the recommendation to discontinue plaintiff's probationary services. See Exhibit "X," annexed to the Leighton Decl. In its subsequent report, the Chancellor's Committee unanimously concurred with the recommendation to discontinue plaintiff's probationary services as assistant principal. Id.

51. Following the reaffirmation of plaintiff's discontinuance, plaintiff brought a state court proceeding, pursuant to Article 78 of the New York State Civil Practice Law and Rules, challenging the discontinuance determination and review.

### F. Plaintiff's Licensures

52. Plaintiff testified that in February 2004, she obtained a general education license but that her status remained that she was teaching under a special education license because, plaintiff alleged, Principal Dixon had not appointed plaintiff under a general education license when bringing her to Public School 149. See Pl. Tr. at 26:4-18.

53. Plaintiff also testified, however, that she did not notify Principal Dixon that plaintiff had received her general education license before or while moving from Public School 161 to Public School 149. Id. at 28:7-12.

54. Thereafter, plaintiff attained her administrator license, and was appointed for the 2005-2006 school year as a probationary assistant principal at Public School 149. See Compl. at ¶¶ 20 – 21.

55. Following her February 2008 discontinuance, in April 2008, plaintiff was advised by DOE that her New York State Teacher Certificate had expired and that plaintiff must act immediately to avoid termination and removal from payroll at the end of the 2007-2008 school year. See Exhibit "V," annexed to the Leighton Decl. Plaintiff testified that she took no action in response to this letter, believing it was an error. See Pl. Tr. at 31:8-13.

56. Thereafter, in May 2008, plaintiff received another letter from DOE again advising her that plaintiff's New York State Teacher Certificate had expired and that plaintiff must act immediately to avoid termination and removal from payroll at the end of the 2007-2008 school year. See Exhibit "V," annexed to the Leighton Decl. Plaintiff testified that in response to this letter, in May or June 2008, she met with an unnamed DOE representative who advised her that plaintiff's special education license was going to expire imminently, that the Department of Education had appointed plaintiff as a special education teacher, and that plaintiff needed to find a job under her general education license. Alternatively, plaintiff testified, she was told in May or June 2008, that the most recent principal for whom she had worked could fix the problem. See Pl. Tr. at 31:18 – 32:19.

57. By letter dated July 2008, plaintiff was advised that because her New York State Education Department records did not contain a valid teaching certificate, her DOE

employment was terminated effective July 1, 2008. Such letter noted that plaintiff had received prior notification regarding her lack of valid certification and that this matter had needed to be addressed before the close of the 2007-2008 school year. See Exhibit "V," annexed to the Leighton Decl.

58. Plaintiff testified that her attorney contacted Principal Dixon in writing, but did not recall when such correspondence occurred. Plaintiff testified that she herself never contacted Principal Dixon with respect to plaintiff's certification. See Pl. Tr. at 32:20 – 33:15.

### G. Plaintiff's Allegation of Discrimination Based on Pregnancy

59. Plaintiff became pregnant in or around September 2007, and informed Principal Dixon in or around October 2007. See Compl. at ¶¶ 24, 27.

60. Plaintiff alleges that other school employees warned plaintiff, in or around November 2007, that Principal Dixon had a problem with plaintiff being pregnant, that Principal Dixon was a "jealous person" and "did not want people to be happy." Also in November 2007, plaintiff alleges that a maintenance employee at the school further advised her that Principal Dixon had been telling people that she wanted plaintiff out of the school. Id. at ¶ 29.

61. Plaintiff testified that she did not recall how or asking how these employees knew this information, and could not recall in detail all school employees who had made such alleged warnings. See Pl. Tr. at 45:9 – 50:8.

62. As concerning Principal Dixon directly, plaintiff alleges that, in or around November, 2007, Principal Dixon requested that plaintiff walk with her outside the school to discuss her pregnancy. See Compl. at ¶ 30. Plaintiff testified that this walk occurred in the early morning prior to beginning work, and that during it plaintiff identified the father of her child to Principal Singletary. See Pl. Tr. at 78:15 – 79:24.

63.     Plaintiff testified that after informing Principal Dixon of the father's identity during this walk, Principal Dixon did not thereafter ever inquire again. Id. at 80:5-24.

H.     **Plaintiff's Allegation of Retaliation**

64.     Plaintiff alleges that in or about the beginning of December 2007, as she walked through the school with Principal Dixon, plaintiff overheard a phone conversation that the school's Business Manager was having, allegedly discussing Principal Dixon's purported misappropriation of funds. Based on Principal Dixon standing next to her, plaintiff alleges that Principal Dixon likewise overheard this conversation, and based on this, allegedly knew that plaintiff had knowledge of supposed wrongdoings. See Compl. at ¶ 33.

65.     Plaintiff testified that she did not know for certain that Principal Dixon had overheard this phone conversation and, further, plaintiff testified that she did not ever discuss with Principal Dixon the phone conversation that plaintiff allegedly overheard. See Pl. Tr. at 96:9-17.

66.     At her deposition, plaintiff testified that in the second week of December 2007, she wrote an anonymous letter to SCI, alleging that Principal Dixon lacked integrity, was dishonest, had stolen school funds, and that she had created an "environment of terror." Id. at 98:20 – 101:1.

67.     Plaintiff testified that she had written the letter anonymously to protect herself from retribution. Id. at 99:12-14. Plaintiff also testified that she wrote the letter to make it sound like it was from a teacher, not from plaintiff, and furthermore made a third-party mention in the letter to herself as, "that one . . . brought with her from 149," as someone having information about the allegations. Id. at 101:2 – 102:16.

68. Plaintiff testified that she was interviewed several times by investigators with respect to the allegations made, with the first interview occurring at SCI's office at 80 Maiden Lane during the Christmas break of 2007. Id.

69. Principal Dixon testified at her deposition that she first became aware of an SCI investigation about her in late-April 2008, when investigators called her in for a meeting. See Dixon Tr. at 38:10 – 40:8.

70. Principal Dixon further testified that she was first advised by SCI of the identity of the complainant in April 2008. Id.

## I. EEOC Charge and Legal Proceedings

71. Plaintiff filed a charge of discrimination based on sex and pregnancy with the Equal Employment Opportunity Commission on or about February 21, 2008, and thereafter received a Right to Sue letter, dated June 25, 2008. See Exhibits "Y" and "Z," annexed to the Leighton Decl.

72. On or about September 10, 2008, plaintiff commenced the instant action by filing her complaint with the Court. See Exhibit "A," annexed to the Leighton Decl.

Dated:   New York, New York
         August 10, 2009

                                    **MICHAEL A. CARDOZO**
                                    Corporation Counsel of the
                                     City of New York
                                    Attorney for Defendants
                                    100 Church Street, Room 2-169
                                    New York, New York 10007
                                    (212) 788-0407

        By: _____
                                   Maxwell D. Leighton
                                    Assistant Corporation Counsel

08 CV 7892 (PGG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIELLE HERBERT,

                                                    Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK CITY BOARD OF EDUCATION, NEW YORK CITY DEPARTMENT OF EDUCATION, and SHANIQUIA L. SINGLETARY-DIXON,

                                                  Defendants.

**DEFENDANTS' 56.1 STATEMENT OF UNDISPUTED FACTS**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-169
New York, N.Y. 10007

Of Counsel: Maxwell D. Leighton
Tel: (212) 788-0407

NYCLIS No. 2008-034147

*Due and timely service is hereby admitted.*

New York, N.Y. .................................., 2008

Signed: ........................................................

Attorney for........................................................