UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIELLE HERBERT,

                          Plaintiff,

            - against -

THE CITY OF NEW YORK, NEW YORK
CITY DEPARTMENT OF EDUCATION,
NEW YORK CITY DEPARTMENT OF
EDUCATION, and SHANIQUIA L. DIXON,

                          Defendants.

08 Civ. 7892 (PGG)

**MEMORANDUM OPINION
AND ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Danielle Herbert claims that while she was employed as an assistant principal at New York City Public School 149, she was discriminated against on the basis of her gender and her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 et seq. ("NYCHRL").  Herbert contends that Defendant Shaniquia Dixon, the principal of Public School 149, terminated her probationary position as an assistant principal because of her pregnancy.  The Complaint also alleges that, in demoting Herbert, Dixon was retaliating against her for reporting Dixon's alleged embezzlement, in violation of N.Y. Civil Service Law § 75-b and N.Y. Education Law § 3028-d.

Defendants have moved for summary judgment on all of Herbert's remaining claims, arguing that she was demoted because of poor performance, and contending – as to the retaliation claim – that there is no evidence that Dixon was aware that Herbert had reported her alleged misconduct.  Defendants' motion for summary judgment (Docket No. 18) will be

DENIED as to Herbert's discrimination claims, because there are material issues of fact as to whether Dixon's decision to demote Herbert was motivated in whole or in part by Herbert's pregnancy.  Defendants' motion will be GRANTED as to the whistleblower retaliation claim, however, because there is no evidence that Dixon was aware – prior to demoting Herbert – that Herbert had reported her alleged misconduct to school district authorities.

## BACKGROUND

Herbert began her teaching career in 1999, serving as a special education teacher at New York City Intermediate School 162.  (Def. 56.1 Stmt. ¶ 2)[1]  In 2000, she transferred to Public School 161, where she worked as a general education teacher.  (Def. 56.1 Stmt. ¶ 3)  During the 2003-04 school year, Defendant Dixon supervised Herbert while serving as assistant principal at P.S. 161.  (Def. 56.1 Stmt. ¶ 4)

After Dixon was hired as the principal of P.S. 149 for the 2004-05 school year, she asked Herbert to join her at that school.  The two agreed that Herbert would serve as a literacy coach and administrative intern at P.S. 149 while pursuing training in educational administration.  (Def. 56.1 Stmt. ¶¶ 6-8)  Upon completion of that training, Dixon promised that she would arrange for Herbert to be promoted to assistant principal.  (Def. 56.1 Stmt. ¶ 8)  Plaintiff obtained her certificate in educational administration and was appointed assistant

---

[1]  To the extent that this Court relies on facts drawn from Defendants' Rule 56.1 statement, it does so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . .  fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with Defendants' characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence.  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

principal of P.S. 149 for the 2005-06 school year on a "probationary" or non-tenured basis.  (Def. 56.1 Stmt. ¶ 9)  Plaintiff remained in the assistant principal position for the 2006-07 school year.

## I.      HERBERT'S 2006-07 JOB PERFORMANCE

In early December 2006, the Special Commissioner of Investigation for the New York City School District ("SCI") received a complaint from the parent of a P.S. 149 student. As to Dixon, the parent complained that students in the June 2006 graduating class had not yet received their yearbooks and class rings.  The parent went on to state, however, that "there is a female assistant principal at the school (name unknown) who is having an affair with a janitor named Earl (surname unknown) and that they are 'touchy feely,' especially in front of students. The principal does nothing and merely allows it to happen."[2]  (Def. 56.1 Stmt. ¶ 14; Leighton Decl., Ex. W)  After Dixon learned of this complaint, she scheduled a meeting with Herbert to "discuss the allegations of [her] 'fraternizing with a member of the custodial staff.'"  (Def. 56.1 Stmt. ¶ 15; Dixon Decl., Ex. G)  In discussing the complaint, Dixon told Herbert that "people . . . were talking about [her] and [Errol] Garvey," a member of the school's custodial staff. (Leighton Decl., Ex. B (Herbert Dep.) at 74)  Herbert denied any inappropriate relationship with Garvey.  (Id. at 78; Pltf. 56.1 Counter-Stmt. ¶ 15)

———————————————

[2]  Plaintiff argues that this and certain letters of complaint submitted to Dixon by other parents are inadmissible hearsay that cannot be considered in connection with Defendants' summary judgment motion.  (Pltf. Br.17)  In ruling on Defendants' motion, of course, this Court may consider only admissible evidence.  See Fed. R. Civ. P. 56(e)(1) ("[a] supporting or opposing affidavit must be made on personal knowledge, set[ting] out facts that would be admissible in evidence. . . ."); Feingold v. New York, 366 F.3d 138, 155 n.16 (2d Cir. 2004) ("In reviewing the district court's grant of summary judgment . . . we may only consider admissible testimony."). This complaint to SCI, and the letters of complaint from parents, are not hearsay, however, because they are not offered to prove the truth of the matter asserted, but instead for the light they shed on Dixon's state of mind in demoting Herbert.  See Fed. R. Evid. 801(c).  Accordingly, these complaints will be considered for purposes of resolving Defendants' motion.

Later during the 2006-07 school year, Dixon issued two disciplinary letters to Herbert.  In a January 30, 2007 letter, Dixon reprimanded Herbert for her failure to ensure that the teachers she supervised were properly maintaining student work portfolios in math and writing.[3]  (Def. 56.1 Stmt. ¶ 12; Dixon Decl., Ex. E)  In an April 12, 2007 letter, Dixon reprimanded Herbert as a result of a complaint from the parent of a special education student.  The parent complained that Herbert had scolded the student for not wearing his uniform, telling him that "the Principal did him a favor by letting the child into the school."  (Def. 56.1 Stmt. ¶ 20; Dixon Decl., Ex. H)[4]  Dixon's letter acknowledges that Herbert's "concerns about [the student's] lack of uniform and his refusal to follow school rules are valid," and she suggests that Herbert speak to the middle school dean "to ensure that [the student] receives the appropriate disciplinary action regarding his misconduct."  (Dixon Decl., Ex. H)  Dixon further states, however, that Herbert's "did him a favor" remark was "unprofessional and inappropriate and . . . showed poor judgment."  (Id.)  Dixon notes that all students "are entitled to education under the law" and that, "[a]s educators[,] we cannot deprive them of that right." Dixon also emphasizes that Herbert is expected to treat all students with respect, and to impose discipline in such a manner that "this type of incident will not occur in the future."  Dixon also warns that "[a]nother occurrence of this nature may result in an unsatisfactory rating for the 2006-2007 school year." (Id.)  Herbert received no further disciplinary letters that year, however, and Dixon rated her

---

[3]  Herbert does not deny that the student portfolios were in poor condition, but contends that "[t]he school culture was such that portfolios were not focused on until after the ELA exam, which occurs in the second week of January."  (Pltf. 56.1 Counter-Stmt. ¶ 12)  The significance of this statement is not clear, given that Dixon's review was conducted on January 30, 2007. (Def. 56.1 Stmt. ¶ 12)

[4]  Herbert did not at the time (and does not in this litigation) dispute that she (1) scolded the child for not wearing his uniform, and (2) told him that "Principal Dixon did him a favor by allowing him to remain in school."  (Pltf. 56.1 Counter-Stmt. ¶ 20)

"satisfactory" for the 2006-07 school year.  (Def. 56.1 Stmt. ¶ 23; Leighton Decl., Ex. C (Dixon

Dep.) at 213)

## II.   <u>HERBERT'S PREGNANCY</u>

Herbert became pregnant in September 2007, early in the 2007-08 school year,

and informed Dixon of her condition in October 2007.  (Def. 56.1 Stmt. ¶ 59)  In November

2007, Dixon questioned Herbert about the identity of the father.  (Def. 56.1 Stmt. ¶ 62)  Herbert

told Dixon that the father was a former junior high school classmate, with whom she had "had a

summer fling."  (Leighton Decl., Ex. B (Herbert Dep.) at 79, 80)

During the late fall and winter of 2007, Dixon received a series of letters from

parents – including the vice president, secretary, and former president of the Parent-Teacher

Association – expressing concern about Herbert's pregnancy, which they assumed was the

product of an affair with Garvey.  (Def. 56.1 Stmt. ¶ 28-30; Dixon Decl., Exs. Q, R, S)  The

letters all stated that Herbert was not setting an appropriate example for the children at the

school.  (Dixon Decl., Exs. Q, R, S)  For example, in a November 8, 2007 letter, the PTA

secretary wrote: "The reason why I am writing this letter now is because Ms. Herbert is now with

child and showing. . . . My concern with that is, 'What kind of example is she setting to the

babies of our school?'  Are we not supposed to lead by example?  How do we teach our children

morals and values [if] what we do is immoral?"  (Dixon Decl., Ex. R)  On November 30, 2007,

the former PTA president wrote:  "Ms. Herbert is now pregnant.  Students and parents alike are

now talking about Errol being the child's father.  Although no one knows for sure, that is the

logical assumption since everyone knew they were an item.  My question to you now is , '*What

type of example are we setting for our students and what is going to be done about it?*'"  (Dixon

Decl., Ex. S) (emphasis in original)  The PTA vice president wrote that "many parents and

students are talking about her pregnancy and our school's Fireman (Errol) being the child's father. . . . My concern is she is the leader of the primary academy.  What examples do we set for our children?"  (Dixon Decl., Ex. Q)

        At her deposition, Dixon testified that she was concerned about the effects of Herbert's pregnancy on the school environment, and noted that after Plaintiff became pregnant, allegedly with Garvey's child, "people were so concerned, over-consumed with this that we could barely get work done.  There was just so much gossiping, so much whispering in corners . . . . it was affecting Ms. Herbert, she was coming in disgusted and it was just a bad situation."  (Pltf. 56.1 Counter-Stmt. ¶ 102)

        On November 29, 2007, Dixon reported the parents' concerns about Herbert and Errol Garvey to SCI.  (Leighton Decl., Ex. C (Dixon Dep.) at 194-97).  Dixon also forwarded the parents' letters to SCI.  (Def. 56.1 Stmt. ¶ 31)  In a January 9, 2008 letter to SCI, Dixon addressed the allegations against Herbert and the effect of her conduct on the school:

> As a result of my investigation of the above complaint . . . I cannot fully substantiate the allegation made by parent Audrey Santos. . . .
>
> Ms. Santos stated that during her conversation with Ms. Herbert, Ms. Herbert did acknowledge that Mr. Garvey is her child's father and yes, they are both married.  However, I have not seen any unprofessional behavior or misconduct between . . . Ms. Herbert and Mr. Garvey. . . .
>
> I can however attest to the fact that this entire matter has been detrimental to the morale of the school.  As a result[,] I requested [that] Mr. Garvey be transferred, and that has occurred.  Ms. Herbert still remains in the building.

(Dixon Decl., Ex. O)

        In addition to her interactions with SCI, Dixon took several steps at P.S. 149 to address issues she believed had been created by Herbert's pregnancy.  Dixon contacted Scott Spring, who supervised Errol Garvey, to discuss the alleged affair between Herbert and Garvey,

and Herbert's pregnancy.  Dixon demanded that Spring transfer Garvey to another school.

Spring refused.  (Deutsch Decl., Ex. 12 (Spring Dep.) at 11, 20)

> Dixon then scheduled a meeting with Spring and his supervisor, Bob Dreyer.

Dixon opened that meeting by saying:  "If you gentlemen are wondering what this matter is in

reference to . . . Errol Garvey has impregnated or gotten my assistant principal pregnant, and

now the entire school is talking about it."  (Pltf. 56.1 Counter-Stmt. ¶ 112-13; Deutsch Decl., Ex.

12 (Spring Dep.) at 19)  Dixon demanded that Garvey be transferred to another school:

> Q      Did Principal [Dixon] ask for Mr. Garvey to be transferred at that time?
>
> A.      Yes, she, did, for the good of the building because of all the rumors going
>           around in the school.
>
> Q      By rumors, you mean Ms. Herbert being pregnant?
>
> A      By the fireman, Errol, yes.

(Deutsch Decl., Ex. 12 (Spring Dep.) at 19; <u>see also</u> Deutsch Decl., Ex. 9 (Dixon Dep.) at 198-

99)  At her deposition, Dixon explained that she demanded that Garvey be transferred because

> there was too much . . . water cooler talk that was interrupting the overall tone of
> the school.  People were so focused on these two, and I say these two, I mean Ms.
> Herbert and Mr. Garvey, that people weren't functioning. . . .

(<u>Id</u>., Ex. 9 (Dixon Dep.) at 198-99)  Ultimately, Garvey agreed to a voluntary transfer, and left

P.S. 149 on December 11, 2007.  (<u>Id</u>. Ex. 12 (Spring Dep.) at 19, 20, 25)

**III.      <u>HERBERT'S ANONYMOUS REPORT TO SCI</u>**

> At the beginning of December 2007, while standing with Dixon outside the office

of P.S. 149's business manager, Katina Williams, Herbert overheard a "40 second" telephone

conversation in which Williams was "talking about a check that [Dixon] had made out to cash

for a thousand dollars [for school related expenses], and she in turn had the check cashed and

used the thousand dollars for a down-payment on one of her cars."  (Deutsch Decl., Ex. 8

(Herbert Dep.) at 93-96; see also Def. 56.1 Stmt. ¶ 64)  At her deposition, Herbert conceded that she could not "say for certain" that Dixon overheard the conversation.  Moreover, Herbert and Dixon never discussed what Herbert overheard.  (Deutsch Decl., Ex. 8 (Herbert Dep.) at 95-96; Def. 56.1 Stmt. ¶ 65)  Herbert subsequently discussed Dixon's alleged misconduct with Williams, however, who told Herbert that Dixon had misappropriated school and student funds on several occasions.  (Pltf. 56.1 Counter-Stmt. ¶ 91)

On December 12, 2007, Herbert sent a letter to SCI alleging that Dixon "lack[ed] integrity, was "dishonest," and had stolen school funds.  (Def. 56.1 Stmt. ¶ 66; Leighton Decl., Ex. B (Herbert Dep.) at 99-100)  Herbert signed the letter "Anonymous," and took other steps to conceal her identity.  For example, she made the letter "sound like it was from a teacher and not from [her]," and referred to herself in the third person as "the one that [Dixon] brought with her from 149."  (Def. 56.1 Stmt. ¶ 67; Leighton Decl., Ex. B (Herbert Dep.) at 99, 102)

Dixon testified that she first became aware of this complaint and the identity of the complainant in April 2008, when she met with SCI investigators.  (Def. 56.1 Stmt. ¶ 69; (Leighton Decl., Ex. C (Dixon Dep.) at 38-40)  There is no contrary evidence.

## IV.   2007-08 DISCIPLINARY LETTERS AND DEMOTION

Shortly after Herbert informed Dixon of her pregnancy in October 2007, Dixon issued the first of four disciplinary letters to Herbert.  On November 7, 2007, Dixon sent Herbert a disciplinary letter in connection with her alleged use of profanity in speaking with Audrey Santos, a vice president of the PTA, who had questioned Herbert about her pregnancy and relationship with Garvey.  (Def. 56.1 Stmt. ¶¶ 25, 26)  In a letter to Dixon, Santos alleges that when she questioned Herbert, Plaintiff replied:  "'*It's my p\*ssy and it don't matter who I give it*

*up to.  As long as I am not f#cking a student, they shouldn't be concerned.*'"[5]  (Dixon Decl., Ex. Q) (emphasis in original)  Dixon's disciplinary letter to Herbert advised her to "continue to work on finding a more professional yet direct approach when communicating with parents."  (Def. 56.1 Stmt. ¶ 28; Dixon Decl., Ex. I)

On January 7, 2008, Dixon issued four separate letters of reprimand to Herbert. The first relates to Herbert's behavior on December 17, 2007, at P.S. 811, an adjoining school. (Def. 56.1 Stmt. ¶ 33-35)  P.S. 811's principal and assistant principal sent a written complaint to Dixon about Herbert's loud berating of P.S. 811's nurse in front of students and staff.  (Id. at 34-35)  Herbert admits calling the nurse "useless," but explains that a student was suffering an asthma attack on December 17, had been hospitalized two weeks before for the same condition, and was at risk of death from the asthma attack.  According to Herbert, the nurse refused to treat the child promptly, and Herbert had "to retrieve the child's medicine herself."  (Pltf. 56.1 Counter-Stmt. ¶ 36)

The email sent to Dixon by P.S. 811's principal provides some support for Herbert's account.  The principal reports that Herbert told him that when she first appeared at P.S. 811 with the asthmatic child – who was admittedly in distress – the nurse's response was, "I work for 811."  The nurse also confirmed that she asked Herbert to retrieve the child's medication, because the nurse did not have suitable medication.[6]  (Dixon Decl., Ex. T)

In the first of the four January 7, 2008 reprimand letters, Dixon advised Herbert that her "behavior and demeanor was unprofessional":

───────────────────────

[5]  Herbert denies using profanity and asserts that she merely told Santos that "parents [can] question me about curriculum and instructional matters, not my personal life."  (Pltf. Counter-Stmt. ¶ 28; Leighton Decl., Ex. B (Herbert Dep.) at 90)

[6]  As noted above, this and the other letters of complaint considered by this Court are not hearsay because they are not offered for their truth, but instead for their effect on Dixon's state of mind.

> Although you might have felt that [Nurse] Brown did not treat you in a professional manner, your first and foremost concern should be the health and safety of the student for whom you are responsible.  An angry and unprofessional display in front of students and staff results in a disservice to the children you are responsible for and places them in danger of not receiving the appropriate care to which they are entitled.  Your ability to prioritize the appropriate actions you should take as "supervisor in charge" during a medical emergency is severely deficient.  You are required as a supervisor to put aside your personal interactions with others you might find distasteful.  Your failure to do this is unsatisfactory and prohibits your ability to meet your primary responsibilities as Assistant Principal.

(Dixon Decl., Ex. K)

The second January 7, 2008 reprimand letter concerns a December 21, 2008 incident involving Herbert and P.S. 149 business manager Katina Williams, whom Dixon had suspended for one week due to alleged unsatisfactory performance.  According to Dixon's letter of reprimand (Dixon Decl., Ex. L), Herbert was aware that Williams had been suspended and was "only permitted to attend her after-school job [on school premises] beginning at 4:00 P.M. daily, for the week she was suspended."  Dixon's letter goes on to state that on Friday, December 21, Herbert nonetheless permitted Williams to remain in the main office work area from approximately 2:09 p.m. until 2:22 p.m.  (Dixon Decl., Ex. L)

Herbert states, however, that she was on the phone reporting a child abuse case when Williams first arrived at the school, that she briefly called Williams over to ask what she was doing in the building, and that Williams stated that she had come to the school to pick up her niece.  (Pltf. 56.1 Counter-Stmt. ¶ 37; Deutsch Decl., Ex. 8 (Herbert Dep.) at 116)  Dixon acknowledged at her deposition that the school safety officer – who is responsible for controlling access to the building – also permitted Williams to stay in the building, because "he thought that [Williams] was waiting for her niece to come down."  (Deutsch Decl., Ex. 9 (Dixon Dep.) at 91,

93)  It also appears that, while waiting for her niece, Williams was standing in an area where guardians or parents commonly wait to pick up students.  Id. at 93.

The third January 7, 2008 disciplinary letter concerns a December 21, 2007 argument between LeShawn Hodge, a school parent coordinator, and Isaiah Simmons, an employee of Harlem Children Zone, which operates a program at the school.  Hodge reported the incident to Dixon in a January 2, 2008 letter.  (Dixon Decl., Ex. U)  Hodge stated that she and Simmons "became engaged in a loud argument in front of the main office, which continued outside of the school building."  (Dixon Decl., Ex. M)  According to Hodge's letter to Dixon, as she was walking by Simmons she said, "Damn people blocking the building."  Simmons then said, "People in here have smart mouths."  Hodge responded, "That's right, so what."  (Dixon Decl., Ex. U)  A "verbal altercation" ensued, which Hodge ended by walking away.  Moments later, outside the school building, Simmons approached Hodge saying, "you stupid bitch."  Two school safety agents then "diffused" the "situation."  (Id.)  Hodge complained to Dixon that Herbert "was sitting in the Main Office during the verbal altercation in the hallway . . . [and] never once came to see what the altercation was about," instead waiting for school safety personnel to intervene.  (Id.)

At her deposition, however, Hodge admitted that the significant part of the altercation – which consumed no more than two to three minutes in total – occurred outside the school building and out of Herbert's view.  (Pltf. 56.1 Counter-Stmt. ¶ 43; Deutsch Decl., Ex. 11 (Hodge Dep.) at 44-45)

In the third January 7 disciplinary letter, however, Dixon reprimanded Plaintiff for "witness[ing] the altercation that began directly outside of the main office and . . . ignor[ing] it."  (Dixon Decl., Ex. M)  Dixon stated that Plaintiff's failure to intervene "immediately placed

members of the school community in danger," and that Herbert's "first response should have

been to hang up the phone, call school safety and accompany the agent to the place where the

argument was occurring." (Id.) Dixon concludes this letter as follows:

> Your ability to respond to situations and emergencies regarding incidents that
> occur in the school, while you are in charge, is seriously flawed. You are
> therefore unable to perform in a satisfactory manner as an Assistant Principal at
> P.S./M.S. 149. You have been informed of your deficiencies on numerous
> occasions both verbally and in writing as documented in your file. Your service
> for the school year 2007-08 is rated as unsatisfactory and I am recommending the
> discontinuance of your probationary service as Assistant Principal.

(Id.)

Herbert asserts, however, that she did not address the altercation immediately

because (1) she was on the phone reporting a child abuse case; and (2) she did not believe that

the altercation was serious, and was only vaguely aware of it. (Pltf. Counter-Stmt. ¶ 41-42;

Deutsch Decl., Ex. 8 (Herbert Dep.) at 118-19)

In her fourth January 7, 2008 disciplinary letter to Herbert, Dixon cites the three

incidents discussed above and then makes reference to the April 2007 reprimand, which involved

Herbert's "did you a favor" remark to a special education student. Dixon ends this letter by

repeating that "[a]s a result of [Herbert's] continued failure to perform in a satisfactory manner

as an Assistant Principal . . . I must rate you unsatisfactory and recommend the discontinuance of

your probationary service. . . ." (Dixon Decl., Ex. N)

In her January 11, 2008 Pedagogical Supervisory Personnel Report concerning

Herbert, Dixon recommends that her probationary service as assistant principal be discontinued.

(Def. 56.1 Stmt. ¶ 47) As a result, Herbert was discontinued as an assistant principal at P.S. 149

and demoted to the position of teacher. (Def. 56.1 Stmt. ¶ 48)

Pursuant to Section 4.3.2 of the By-Laws of the Panel for Educational Policy of

the City School District of the City of New York, Plaintiff sought review of her discontinuance.

(Def. 56.1 Stmt. ¶ 49)  After a June 25, 2008 hearing, the Chancellor's Committee unanimously concurred with the recommendation to discontinue Herbert's services as assistant principal. (Def. 56.1 Stmt. ¶ 50; Leighton Decl., Ex. X)  Plaintiff's subsequent CPLR Article 78 proceeding to challenge the discontinuance was dismissed.  (Def. 56.1 Stmt. ¶ 51; Deutsch Decl., Ex. 6)

## DISCUSSION

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation omitted).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown

v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.  Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars." Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)  ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

A district court should exercise "an extra measure of caution" before granting summary judgment in a discrimination case, however, "because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  The Second Circuit has noted that "in discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." Mandell v. County of  Suffolk, 316 F.3d 368, 377 (2d Cir. 2003)

## II.   DISCRIMINATION CLAIMS

The framework for analyzing Title VII cases is well established:[7]

> [Under] the familiar "burden-shifting" framework set forth for Title VII cases by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) and <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981), . . . the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

<u>Holcomb</u>, 521 F.3d at 138 (quoting <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

### A.   Prima Facie Case

In order to establish a <u>prima facie</u> case of discrimination, Herbert must show: "(1) that she belonged to a protected class; (2) that she was qualified for the position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." <u>Holcomb</u>, 521 F.3d at 138.  Plaintiff's burden in presenting a <u>prima facie</u> case is "not onerous"; indeed, it is "de minimis." <u>Burdine</u>, 450 U.S. at 253; <u>Beyer</u>, 524 F.3d at 163; <u>see also Hollander v. American</u>

---

[7] Herbert has not separately argued her claims under Title VII, the NYSHRL, and the NYCHRL.  Accordingly, this Court will apply the same analysis to all of her discrimination claims.  <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010) ("[A] plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); <u>Salamon v. Our Lady of Victory Hospital</u>, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (treating Title VII and NYSHRL sex discrimination claims "as analytically identical [and] applying the same standard of proof to both claims"); <u>Dawson v. Bumble & Bumble</u>, 398 F.2d 211, 216-27 (2d Cir. 2005) (applying Title VII framework to claims brought under both the NYSHRL and NYCHRL).

Cyanamid Co., 172 F.3d 192, 199 (2d Cir. 1999) ("[T]he burden of proof that must be met to establish a prima facie case is minimal.").  Although the standard for a prima facie case is low, "a plaintiff's case must fail if [she] cannot carry this preliminary burden."  Beyer, 524 F.3d at 163.

   Here, Defendants argue that Herbert has failed to make out a prima facie case because "she [has failed] to show that she satisfactorily performed her duties as an assistant principal."  (Def. Br. 3-4)  But as the above-cited language from Holcomb makes clear, a plaintiff need not demonstrate "satisfactory performance of job duties" in order to make out a prima facie case.  The prima facie showing requires only a showing that she was "qualified for the position she held."  Holcomb, 521 F.3d at 138.  In order to satisfy this prong, Plaintiff "'need not show perfect performance or even average performance,'" Gregory v. Daly, 243 F.3d 687, 697 (2d Cir. 2001) (quoting Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1283 (7th Cir. 1977), but only that she "'possesses the basic skills necessary for performance of the job."  Id. (quoting Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991)); see also Slattery v. Swiss Reassurance Am. Corp., 248 F.3d 87, 92 (2d Cir. (2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.").

   In this case, it is undisputed that at the time of her demotion, Plaintiff had been a teacher in the New York City schools since 1999; that she had earned a promotion in 2005 to the position of Assistant Principal; and that she had received a "satisfactory" rating for the 2006-07 school year.  (Def. 56.1 Counter-Stmt. ¶¶ 3-7, 23; Herbert Aff. ¶10)  Herbert's experience and

history of satisfactory performance are sufficient to demonstrate that she was "qualified for the position she held."[8]

Defendants do not and could not credibly dispute that Herbert has offered sufficient evidence to make out the three remaining elements of prima facie case.  It is clear that Plaintiff belonged to a protected class:  Title VII prohibits discrimination "because of . . . sex" and designates "pregnancy, childbirth, or related medical conditions" as one form of sex-based discrimination.  42 U.S.C. § 2000e2-2(a)(1); § 2000e(k).  Defendants were on notice of Herbert's pregnancy as of October 2007 and knew that she was a member of this protected class.  (Def. 56.1 Stmt. ¶ 59)

It is also clear that Herbert suffered an adverse employment action when she was discontinued as Assistant Principal on January 7, 2008.  "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms or conditions of employment."  Galabya v. New York City Dept. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (quoting Richardson v. New York State Dept. of Correctional Servs., 180 F.3d 426, 446 (2d Cir. 1999)).  Such a change "'might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'"  Galabya, 202 F.3d at 640 (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993

---

[8]  In arguing that Herbert has not made out a prima facie case, Defendants point to the several disciplinary "letters and memoranda" Dixon issued to Herbert during the two school years leading up to her demotion.  (Def. Br. 4)  These alleged performance issues, which according to Defendants were the reason for Herbert's demotion, are properly addressed as part of the second prong of the McDonnell-Douglas test, however, and not as part of Plaintiff's prima facie case:  "[T]he qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision."  Gregory, 243 F.3d at 697.

F.2d 132, 136 (7th Cir. 1993)).  Here, Herbert's demotion from assistant principal to teacher "diminished [her] material responsibilities" and caused her to hold a "less distinguished title." This constitutes an adverse employment action within the meaning of Title VII.

Finally, Plaintiff has presented evidence from which a reasonable jury could find that her demotion occurred under circumstances giving rise to an inference of discrimination. Like the "qualifications" prong of the prima facie case, this is a "low threshold," Holcomb, 521 F.3d at 139, and the necessary inference "may be derived from a variety of circumstances, including, but not limited "'the sequence of events leading to the plaintiff's discharge.'" Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)); see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (inference of discrimination permissible where employer transferred plaintiff's duties to two younger employees after plaintiff's termination).

Here, Dixon expressed her disapproval of Herbert's pregnancy and her belief that it "ha[d] been detrimental to the morale of the school," and Dixon's disciplinary actions concerning Herbert – during the 2007-08 school year – began soon after Herbert disclosed that she was pregnant.  Dixon believed that Herbert's pregnancy presented an enormous distraction at the school, attracting so much attention that "we could barely get work done."  (Pltf. 56.1 Counter-Stmt. ¶ 102)  Dixon also reported to SCI parents' concerns as well as her own concerns about Herbert's pregnancy and the effect that the pregnancy was having on the school. (Leighton Decl., Ex. C (Dixon Dep.) at 194-97; Dixon Decl., Ex. O)  Indeed, Dixon told SCI that "this entire matter has been detrimental to the morale of the school."  (Dixon Decl., Ex. O) Herbert was ultimately replaced as assistant principal by a woman who was not pregnant.  (Pltf. 56.1 Counter-Stmt. ¶ 127)

Dixon also took action against Garvey, Herbert's alleged paramour, demanding that he be transferred.  (Deutsch Decl., Ex. 12 (Spring Dep.) at 11, 20)  In demanding that Garvey be transferred, Dixon cited his role in "get[ing] my assistant principal pregnant" and the fact that "now the entire school is talking about [Herbert's pregnancy]."  (Pltf. 56.1 Counter-Stmt. ¶ 112-13; Deutsch Decl., Ex. 12 (Spring Dep.) at 19)  Given this evidence, a reasonable jury could conclude that Herbert's pregnancy played a role in Dixon's decision to demote Herbert.

### B.    Defendants' Proffered Reasons for Herbert's Demotion

Because Herbert has made out a prima facie case of pregnancy-based discrimination, "the burden [of production] shifts to the [D]efendant[s] to articulate 'some legitimate, non-discriminatory reason'" for Plaintiff's discontinuance as assistant principal. Holcomb, 521 F.3d at 138 (quoting Burdine, 450 U.S. at 253).  "'The defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (quoting Burdine, 450 U.S. at 254-55) (emphasis in original).

Here, Defendants argue (Def. Br. 5) that Herbert was demoted solely because of poor performance,[9] citing five alleged acts of unprofessional conduct:  (1) the March 2007 incident in which Herbert told a special education child that Dixon "did him a favor" by permitting him to remain in the school (Def. 56.1 Stmt. ¶ 20); (2) the November 2007 incident in which the PTA vice president reported that Herbert had used profanity in responding to the

[9]  Defendants do not contend that Herbert's alleged relationship with Garvey played any role in their demotion determination.

parent's expression of concerns about the pregnancy (Dixon Decl., Ex. Q); (3) the December 2007 incident in which the principal of an adjoining school claimed that Herbert had publicly berated a school nurse (Dixon Decl., Ex. T); (4) Herbert's failure to escort a suspended employee promptly out of the school building on December 21, 2007 (Dixon Decl., Ex. L); and (5) Herbert's failure to address an altercation between LeShawn Hodge and a Harlem Children Zone employee on December 21, 2007.  (Dixon Decl., Ex. M)

Because Defendants have articulated non-discriminatory reasons for Herbert's demotion and have supported their proffered reasons with citations to admissible evidence, they have met their burden of production under the McDonnell-Douglas test.

**C.     Herbert's Claim That These Reasons Are Pretextual**

Because of Defendants' showing, the burden next shifts to Plaintiff to demonstrate that Defendants' proffered reasons were pretextual, and that the real reason for her demotion was discrimination based on her pregnancy.  In this regard, proof that an employer's proffered reasons are false may be "quite persuasive." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).  A Title VII plaintiff may also offer evidence of remarks made by the employer at or about the time of the adverse action "to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Tomassi v. Insigna Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2006).  "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the alleged discriminatory behavior, the more probative that remark will be." Id.  Here, issues of fact remain as to whether the five alleged acts of "unprofessional conduct" cited by Defendants were in fact the reason for Herbert's demotion.

In considering the misconduct cited by Defendants, this Court recognizes that the question is not "whether the employer reached a correct conclusion in attributing fault [to the plaintiff] . . ., but whether the employer made a good-faith business determination."  Baur v. Rosenberg, Mine, Falkoff & Wolff, 2008 U.S. Dist. LEXIS 99819, at *5 (S.D.N.Y. Dec. 2, 2008); see also McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what motivated the employer. . . ." (emphasis in original) (internal quotation omitted)); Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status.").  Here, however, Herbert has offered evidence suggesting that Dixon may have had reason to question the significance of the incidents she cited, or may have improperly relied on events that occurred outside the relevant time period. And, as discussed below, the adverse employment action against Herbert took place in a context in which Dixon had repeatedly expressed concerns about Herbert's pregnancy.

The first incident cited by Defendants, concerning Herbert's March 2007 remark to the special education student, occurred during the 2006-07 school year, for which Herbert received a "satisfactory" rating.  Thus, it bears little causal relationship to her demotion in January 2008; indeed, the New York City Department of Education instructs managers such as Dixon not to consider "events which pre- or post-date the period of evaluation" when assessing a pedagogical employee such as Herbert.  (Deutsch Decl., Ex. 2)

With respect to the second incident – alleging the use of profanity in addressing concerns expressed by the PTA vice president – Herbert not only denies having engaged in such

conduct, but also has produced evidence suggesting that Dixon had reason to doubt the authenticity of Santos's letter, because Santos is a "functioning illiterate." (Pltf. 56.1 Counter-Stmt. ¶ 28; Dixon Decl., Ex. Q; Deutsch Decl., Ex. 8 (Herbert Dep.) at 91)

    Herbert has also presented evidence to demonstrate that the email Dixon received about Herbert's confrontation with the P.S. 811 nurse was more ambiguous than Dixon revealed in her disciplinary letter regarding that incident. The email from P.S. 811's principal to Dixon acknowledged that, when Herbert requested medication for an asthmatic child in serious distress, the nurse responded by telling Herbert "I work for 811." The email also acknowledged that Herbert ultimately had to retrieve the child's medicine herself. (Dixon Decl., Ex. T) But Dixon's disciplinary letter simply reprimands Herbert for her "behavior and demeanor" and suggests that Herbert failed to protect "the health and safety of the student for whom [she was] responsible." (Dixon Decl., Ex. K) A rational jury could find that Dixon exaggerated the egregiousness of Herbert's behavior during this incident.

    Herbert has also presented evidence suggesting that Dixon did not act in good faith in reprimanding her for permitting Williams – who had been suspended for one week – to enter and remain in the school building. It is undisputed that (1) a school safety officer permitted Williams to enter and remain in the school building; (2) Williams was waiting inside the building to pick up her niece – which parents or guardians are permitted to do; (3) even during the period of her suspension, Williams was permitted to enter the building for purposes of her work with the Harlem Children Zone; (4) Williams was only briefly inside the building; and (5) Williams' presence in the building presented no safety issue. (Pltf. 56.1 Counter-Stmt. ¶ 37; Deutsch Decl., Ex. 8 (Herbert Dep.) at 116; Deutsch Decl., Ex. 9 (Dixon Dep.) at 86, 89-90; Dixon Decl., Ex. L)

These facts, and Dixon's testimony concerning these facts, suggest that Dixon knew the incident was not as protracted or serious as her disciplinary letter portrays it to be.

Finally, Herbert has presented evidence discrediting Defendants' account of the "altercation" between Hodge and Simmons, which Herbert was accused of ignoring.  In Hodge's letter to Dixon complaining about the incident, Hodge acknowledges that the significant part of the "altercation" took place outside of the school and presumably outside of Herbert's hearing, and was "diffused" by two school safety agents.  (See Dixon Decl., Ex. U)  This calls into question the sincerity of Dixon's disciplinary letter, which describes the incident as an "emergenc[y]" and a "potentially dangerous incident," to which Plaintiff's "first response should have been to hang up the phone, call school safety and accompany the agent to the place where the argument was occurring."  (Dixon Decl., Ex. M)  There is also no evidence that Hodge and Simmons – the individuals who actually engaged in the "altercation" were punished in any way – nor is there any evidence that the school safety agents – who presumably are primarily responsible for maintaining order at and around the school – were disciplined.

In sum, "credit[ing] all factual inferences that could rationally be drawn[] in favor of [Herbert]," as this Court must do, Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001), a rational jury could conclude that Defendants' proffered reasons for demoting Herbert are false. Moreover, in addition to the evidence discussed above, Herbert has submitted substantial affirmative evidence demonstrating that at and around the time Dixon was disciplining Herbert, she was deeply concerned about the effect Herbert's pregnancy was having on the school community.  This evidence was discussed in connection with this Court's prima facie case determination (see pp. 18-19, supra) and that discussion will not be repeated here.

Defendants argue, however, that Herbert "cannot establish that the basis for [Dixon's] actions constituted pretext . . . when [the record] readily establish[es] that Principal Dixon acted . . . in response to allegations and concerns brought by other individuals."  (Def. Reply Br. 6)  Dixon's intent and state of mind here presents a question of fact, however.  Dixon herself repeatedly expressed concerns about the effect of Herbert's pregnancy on the school community, and many of the concerns about Herbert raised by "other individuals" relate to Herbert's pregnancy.  (See Dixon Decl., Exs. Q, R, S)  It is no defense to a charge of pregnancy discrimination that the decision-maker was engaging in pregnancy discrimination at the behest of others.

To defeat summary judgment, Herbert need only show that "the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  The evidence that Defendants' proffered reasons were false, and Dixon's contemporaneous statements that Herbert's pregnancy was having a detrimental effect on the school, permit a "rational inference" that Defendants' true motives were discriminatory.  Accordingly, there are material issues of fact as to whether Defendants' proffered reasons for Herbert's demotion were a pretext for pregnancy discrimination.

## III.   WHISTLEBLOWER CLAIMS

Herbert alleges that Defendants retaliated against her, in violation of New York Civil Service Law § 75-b and New York Education Law § 3208-d, for filing a complaint with SCI concerning Dixon's alleged embezzlement.  As discussed above, Herbert's anonymous complaint to SCI – submitted on or about December 12, 2007 – accused Dixon of lacking integrity, being dishonest, and stealing school funds.  (Def. 56.1 Stmt. ¶ 66)

New York State Civil Service Law § 75-b forbids a public employer from taking disciplinary or adverse personnel action against a public employee who discloses a violation of law, rule, or regulation:

> A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information:  (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.  "Improper governmental action" shall mean any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation.

N.Y. Civil Service Law § 75-b(2)(a).

New York Education Law § 3028-d addresses the "[p]rotection of school employees who report information regarding illegal or inappropriate financial practices":

> Any employee of a school district, board of cooperative educational services, or charter school having reasonable cause to suspect that the fiscal practices or actions of an employee or officer of a school district, charter school, or board of cooperative educational services, violate any local, state, federal law or rule and regulation, relating to the financial practices of such entity and who in good faith reports such information to an official of such school district, board of cooperative educational services or charter school, or to the office of the state comptroller, the commissioner or to law enforcement authorities, shall have immunity from any civil liability that may arise from the making of such report, and no school district, or employee or officer thereof, charter school, or employee or officer thereof, or board of cooperative educational services, or employee or officer thereof, shall take, request, or cause a retaliatory action against any such employee who makes such report.

N.Y. Educ. Law § 302.

Courts interpreting Civil Service Law § 75-b have recognized that to state a prima facie case of retaliation, a plaintiff must offer evidence demonstrating that the decision-maker responsible for the adverse personnel action was aware of the plaintiff's complaints.  See

25

<u>Manessis v. New York City Dept. of Transp.</u>, No. 02 Civ. 359 (SAS), 2003 WL 289969, at * 15 (S.D.N.Y. Feb. 10, 2003) ("Plaintiff cannot establish a <u>prima</u> <u>facie</u> Whistleblower retaliation claim because he has offered no evidence that [defendants] were even aware that he had filed complaints with the IG's Office. . . . [Defendants] cannot be liable for retaliation if they had no knowledge of plaintiff's IG complaints.  Accordingly, plaintiff's Whistleblower claim fails as a matter of law and must be dismissed."); <u>Palmer v. Niagara Frontier Transp. Auth.</u>, 56 A.D.3d 1245, 1246 (4th Dep't 2008) ("[D]efendant established that the supervisors who terminated plaintiff's employment were unaware of plaintiff's disclosure, and thus there is no causal connection on the record before us between the disclosure of plaintiff's safety concerns and plaintiff's termination.").

Here, Herbert has not offered evidence demonstrating that Dixon was aware – at the time she recommended Herbert's demotion in January 2008 – that Herbert had filed a complaint with SCI.  Indeed, Dixon has testified that she first learned that Herbert had submitted a complaint in April 2008, three months after recommending Herbert's demotion.  (Def. 56.1 Stmt. ¶ 70)  While Herbert claims that Dixon received a copy of her anonymous letter to SCI in December 2007 (Pltf. Counter-Stmt. ¶ 69; Herbert Aff. ¶ 26), given that Herbert submitted the letter anonymously (Deutsch Decl., Ex. 8 (Herbert Dep.) at 98) and referred to herself in the third person to protect her anonymity (<u>id.</u> at 99), there is no basis for finding that Dixon's December 2007 receipt of the anonymous letter establishes Dixon's knowledge that Herbert was the complainant.

Herbert argues, however, that Dixon was aware that Herbert had overheard Business Manager Katina Williams discussing Dixon's embezzlement in December 2007, and would have likely inferred that Herbert reported this misconduct a short time later in the

anonymous letter to SCI.  (Cmplt. ¶ 33; Pltf. Br. 19)  Herbert's argument requires this Court to draw multiple inferences, however, none of which is supported by the evidence.

   As an initial matter, there is no evidence that Dixon overheard Williams' telephone conversation.  When asked at her deposition whether Dixon overheard Williams's telephone conversation, Herbert responded, "I cannot say for certain."  (Leighton Decl., Ex. B (Herbert Dep.) at 96)  Even if this Court could find that Dixon heard the conversation, and was aware that Herbert overheard the conversation as well, it would then have to infer that Dixon inferred that Herbert was the complainant when she was shown the anonymous letter to SCI in December 2007.  Given Herbert's steps to protect her identity, however – including referring to herself in the third person – there is no rational basis to draw such an inference.  Moreover, Dixon denies having any knowledge of the complainant's identity until April 2008, long after Herbert was demoted.  (Def. 56.1 Stmt. ¶ 70)  In short, there is no evidence in the record to suggest that Dixon knew at the time of Herbert's demotion in January 2008 that the December 2007 complaint to SCI was authored by Herbert.[10]  Herbert cannot rely on conjecture and speculation – and that is all there is here – to defeat Defendants' summary judgment motion concerning the whistleblower retaliation claim.  See Manessis, 2003 WL 289969, at * 15 (dismissing N.Y. Civil Service § 75-b retaliation claim because decision-maker lacked knowledge of plaintiff's complaint); see also Murray v. Visiting Nurse Servs. of NY, 528 F.

---

[10]  Herbert also states, in a conclusory fashion, that her relationship with Dixon deteriorated in December 2007 after she sent her anonymous letter to SCI.  (Pltf. Br.19; Pltf. 56.1 Counter-Stmt. ¶ 65)  Absent supporting facts, however, these conclusory statements are not entitled to any weight, particularly in light of Herbert's repeated assertions – in her Rule 56.1 Counter-Statement – of a deteriorating relationship.  See, e.g., Pltf. 56.1 Counter-Stmt. ¶ 77 (relationship "started to change in 2006-07 academic year"), ¶ 81 ("relationship with Principal Dixon got 'progressively worse' when Plaintiff told her that she was pregnant in October 2007").

Supp. 2d 257, 271 (S.D.N.Y. 2007) (noting in Title VII retaliation context that "district courts have consistently held that, with regard to the causation prong of the prima facie standard, absent any evidence to support an inference that the decision-makers knew of plaintiff's complaints, plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation"); Gross v. National Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002) ("Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.).

Because Herbert has not offered any evidence that Dixon knew – at the time she recommended Herbert's demotion in January 2008 – that Herbert had authored the December 2007 anonymous complaint to SCI, Defendants are entitled to summary judgment on Herbert's whistleblower retaliation claim.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's whistleblower claims (Fourth and Fifth Claims for Relief) and otherwise DENIED. The Clerk of the Court is directed to terminate the motion (Docket No. 18).

Dated: New York, New York
      October 7, 2010

                        SO ORDERED.

                        Paul G. Gardephe
                        United States District Judge

28